UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOOVER INVESTMENTS, INC.,

        Plaintiff,

v.

CITY OF CHARLOTTE,

        Defendant.
_____/

Case No. 1:04-CV-689

HON. RICHARD ALAN ENSLEN

**OPINION**

This matter is before the Court on Defendant City of Charlotte's Motion to Dismiss and Plaintiff Hoover Investment, Inc.'s Motion for Summary Judgment.

**I.    Background**

This is a diversity suit arising from Defendant's alleged breach of contract (the "Agreement") made in 1999 between Plaintiff and Defendant. On July 27, 1999, Plaintiff and Defendant entered an Agreement for the sale and purchase of approximately 19 acres of property ("Property") then owned by Plaintiff. The Property is located within the City of Charlotte and includes a number of former "lagoon areas" or "cells" which had been used in the past for disposal of wastes from an anodizing operation prior to 1975. (Compl., ¶ 9; Ans., ¶ 9.) Defendant wished to purchase the Property to develop it as a city park.

After initial discussions regarding the sale of the Property and prior to the purchase of the Property, Defendant hired an environmental consulting firm to conduct a "Phase One" environmental assessment of the Property, including the lagoon areas. (Compl., Ex. 2.) The Phase One evaluation was completed on September 25, 1998. (Compl., Ex, 3, Memo. to City Manager.) A more extensive

1

environmental evaluation was completed on November 16, 1998.  (Compl., Ex. 4, Memo. to City Manager.)  The results of the evaluations determined that remediation costs were expected to reach approximately $200,000.00. *Id.*

After the environmental evaluations and further discussions, Defendant and Plaintiff entered into the Agreement on July 27, 1999.  The purchase price was $100.00.  (Def.'s Resp. at 3.)  The Conditions section of the Agreement states that:

> a. The City, at the City's sole cost, expense and control, within three (3) years from the date of this Agreement, will Secure the Equalization Cell in accordance with all applicable local, state, federal laws, regulations and legislation. The City will also be responsible for any environmental compliance of any other parcel within or upon the premises, subject to State and Federal laws and restrictions.
>
> b. The City agrees that no buildings, structures, or other permanent construction shall be placed on any part of the Property that is currently identified as a "Cell" on the attached drawing, unless determined to be physically and environmentally suited to such use by a licensed professional engineer.  Such restriction will be made a permanent part of the deed registration.

(Compl., Ex. 9.)

After the sale was complete, Defendant requested the Michigan Department of Environmental Quality ("MDEQ") to implement a state-funded remediation of the Property. (Compl., ¶ 28; Ans., ¶ 28.)  The MDEQ spent approximately $1,200,000.00 in investigating and remediating the Property.  *Id.*  The MDEQ has since requested Plaintiff to reimburse the State of Michigan for its costs.  (Compl., Ex. 11.)  Plaintiff brings this action, in part, to recover those costs.

Plaintiff's Complaint includes the following Counts: Count One - Breach of Contract; Count Two - Promissory Estoppel; Count Three - Unjust Enrichment; and Count Four - Declaratory Judgment.  Plaintiff brings this Motion for Summary Judgment as to Plaintiff's Count One.

Defendant's Motion to Dismiss rests upon its defense that the acts of Defendant were *ultra vires* and the Agreement violates the Michigan Constitution of 1963 art. 7, § 26. Article 7, § 26, states that "[e]xcept as otherwise provided in this constitution, no city or village shall have the power to loan its credit for any private purpose or, except as provided by law, for any public purpose."

Defendant also argues that the Agreement was made in violation of the City Charter because the City Council was never presented with, or formally adopted, the final language of the Agreement. Defendant further contends that this Court should abstain from exercising jurisdiction over this matter because Defendant's defense raised under the Michigan Constitution should be more properly determined by a state court.

## II.     Defendant's Motion to Dismiss

### A.  Abstention

Defendant's abstention argument is premised on the holdings in *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959) and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and the cases further describing those abstention doctrines.

"'Abstention from the exercise of federal jurisdiction is the exception, not the rule.' . . . Abstention rarely should be invoked, because the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) (quoting *Colorado River*, 424 U.S. at 813, 817); *accord Caudill*, 301 F.3d at 660; *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001). Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. Untied States*, 424 U.S. 800, 813 (1976); *see also Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658 (6th Cir. 2002). The doctrine of abstention is based

3

on principles of federalism and comity. *Caudill*, 301 F.3d at 660 (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)). Nonetheless, exceptional circumstances may exist in a case to support abstention. *See Colorado River*, 424 U.S. at 813-19; *Ada-Cascade Watch Co. v. Cascade Res. Recovery, Inc.*, 720 F.2d 897, 901-03 (6th Cir. 1983).

### i. The Thibodaux Doctrine

In *Meredith v. Winter Haven*, 320 U.S. 228 (1943), the Supreme Court held that federal courts should not abstain in diversity cases when the state law is unclear. However, in *Thibodaux*, the Supreme Court held that there are some situations when it is appropriate for a federal court to abstain in diversity cases. Specifically, the *Thibodaux* Court held that federal courts should abstain in diversity cases if there is uncertain state law and an important state interest that is "intimately involved" with the government's "sovereign prerogative." *Thibodaux*, 360 U.S. at 28. For example, in *Kaiser Steel Corp. v. W.S. Ranch Co.*, 391 U.S. 593 (1968), plaintiff claimed authority under a state statute to use the water under defendant's land. The Supreme Court determined that the state law at issue in *Kaiser* was of "vital concern in the arid State of New Mexico" and the district court properly stayed the federal proceedings under *Thibodaux*. *Id.* at 594-95; *see also Slyman v. City of Willoughby, Ohio*, 134 F.3d 372, **3 (6th Cir. 1998) (unpublished) (finding *Thibodaux* abstention proper in cases "intimately involved with sovereign prerogative").

In this case, Defendant asserts that this Court should abstain from determining this case because there is limited case law interpreting what constitutes "lending of credit" under Michigan's Constitution of 1963 art. 7, § 26. Although it is true that the Court can find no Michigan case law which addresses the exact defense raised by Defendant - that is, that the contract amounted to a lending of the city's credit for private use - the Michigan courts have made decisions which guide

this Court's determination of the question of state law.  *See, e.g., Advisory Op. re Constitutionality of 1966 PA 346*, 158 N.W.2d 416 (Mich. 1968); *In re Request for Advisory Op. on Constitutionality of 1986 PA 281*, 422 N.W.2d 186, 197 (Mich. 1988); *Alan v. Wayne Co.*, 200 N.W.2d 628 (1972); *Cordova Chem. Co. v. Dep't of Natural Res.*, 536 N.W.2d 860, 864-65 (Mich. App. 1995); *Stolaruk Corp. v. Cent. Nat'l Ins. Co. of Omaha*, 522 N.W.2d 670, 674 (Mich. App. 1994).  Therefore, the Court will deny Defendant's request for abstention under *Thibodaux*.

### ii. The *Burford* Doctrine

Under the *Burford* doctrine of abstention, a federal court may abstain from interfering with proceedings or orders of state administrative agencies where: (1) there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (citing *Colorado River*, 424 U.S. at 814); *see also Burford*, 319 U.S. at 324, 327-31; *Habich v. City of Dearborn*, 331 F.3d 524, 532 (6th Cir. 2003); *Caudill*, 301 F.3d at 660-61.  *Burford* abstention is not appropriate, however, "merely because resolution of a federal question may result in the overturning of a state policy."  *Zablocki v. Redhail*, 434 U.S. 374, 380 n.5 (1978).  The state must exhibit an overriding interest in the subject matter, and centralize review in a forum with special competence.  *Ada-Cascade Watch Co.*, 720 F.2d at 903.  "The key question is whether an erroneous federal court decision could impair the state's effort to implement its policy."  *Id.; accord Quackenbush*, 517 U.S. at 728.

5

Defendant contends that Plaintiff "remains enmeshed in the highly specialized area of contaminated site regulation within the state of Michigan." (Def.'s Resp. at 13.) Upon review of the briefings, Plaintiff appears to be undergoing an evaluation by the MDEQ to determine, among other issues, whether it has an ability to pay MDEQ's costs. (Def.'s Resp. at 14; Pl.'s Reply at 2.) Although the Court's determination of this case may indirectly effect the MDEQ's determination of Plaintiff's ability to pay, it would not impair the state's effort to implement its policy. Therefore, the Court will not abstain under *Burford* and Defendant's Motion to Dismiss will be denied.

### III.    Motion for Summary Judgment

#### A.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact. The party moving for summary judgment bears the initial burden of specifying the basis on which summary judgment should be granted and identifying portions of the record which demonstrate the absence of a genuine issue of material fact. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). Once this initial burden is met, the non-moving party has the burden of presenting specific facts, supported by the record, showing a genuine issue of material fact. *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

B. Analysis

The issue raised by the parties is not whether the Agreement was breached, but whether Defendant exceeded its power by forming the Agreement in the first place. Defendant admits this suit arises out of a breach of contract of the Agreement. (Ans., ¶ 1.) However, Defendant asserts that, while the parties were acting in good faith, Defendant "engaged in conduct which amounted to an unlawful extension of credit to a private party" contrary to the Michigan Constitution of 1963 art. 7, § 26. (*Id.*) Defendant asserts, therefore, its actions were *ultra vires*.

In light of Defendant's admission of breaching the Agreement, three questions remain to be determined by the Court when considering Plaintiff's Motion for Summary Judgment. The first question is whether the Agreement was made in violation of the Charter and is unenforceable because the City Council did not specifically authorize the language of the Agreement. The second question is whether the Agreement amounts to an "unlawful extension of credit to a private party" in violation of the Michigan Constitution. The third question is whether the Agreement is unenforceable because Defendant's actions in forming the Agreement were *ultra vires*. The Court will now address each question in turn.

### i. Charlotte City Charter

Michigan Compiled Laws § 117.3(j) allows for cities to enter into contracts as provided by each city's charter. The Charter of the City of Charlotte provides in § 15.1 that:

(a) The power to authorize the making of contracts on behalf of the city is vested in the Council and shall be exercised in accordance with the provisions of law.

7

> (b) All contracts, except as otherwise provided by ordinance in accordance with the provision of Section 15.2 hereof, shall be authorized by the Council and shall be signed on behalf of the city by the Mayor and the clerk.

(Charlotte City Charter at § 15.1; *see also* Def.'s Resp. at 17.) Defendant contends that, since the Agreement was not presented to the Council in its final form, the Agreement was not formed in accordance with the Charter and is unenforceable. However, Defendant cites no case law indicating that the Council must approve the specific language of the contract itself. (Def.'s Resp. at 18.) The case law does indicate that, generally, cities are bound by the limitations set by their charters. *See, e.g., Joy Mgmt. Co. v. Detroit*, 440 N.W.2d 654 (1989).

In this case, the Council voted to obtain an environmental assessment prior to the purchase of the Property. (Compl., Ex. 2, Certified Excerpt of July 27, 1998, City Council Meeting.) Both a Phase One evaluation (preliminary site review), a Baseline Environmental Assessment and a Compliance Analysis were performed on the Property prior to the Agreement and at the request of the City Council. (Compl. Ex. 3, Sept. 25, 1998, Memo. from Matt Dugener; Compl., Ex. 4, Nov. 16, 1998, Memo. from Matt Dugener.)

At the February 8, 1999, City Council meeting, the Council discussed the possibility of obtaining a grant from the State of Michigan to cover the costs of improving the Property, including addressing compliance with environmental regulations. (Compl., Ex. 6, Certified Excerpt of February 8, 1999, City Council Meeting.) The City Council passed a vote of five to one "to proceed with the purchase of the Hoover Property in the amount of $100 and postpone filing a compliance analysis until the grant is committed." *Id.* By the vote of the Council, the Mayor and clerk were given power to execute the Agreement on behalf of the City. That process meets the requirements

set forth in the Charlotte Charter and, therefore, the Agreement is valid and enforceable. *See also* McQuillin, MUNICIPAL CORPORATIONS, § 2915 at 307 (3d. 1999).

Although the final language of the Agreement was not submitted to the City Council, the record indicates that the Council was aware of the need for remediation measures to be taken prior to the Council's intended use of the Property as a city park. The minutes of the February 8, 1999, City Council meeting indicate that the City Council believed the City would receive a grant from the State to cover the costs of improving the Property.[1] *Id.*

Section 15.1 of the Charter indicates that all contracts "shall be authorized by the Council and shall be signed on behalf of the city by the Mayor and the clerk." The Council voted to purchase the Property for $100.00 at the February 8, 1999 meeting. There is no indication from the minutes of the Council meeting that the Council did not intend and would not have approved the language of the Conditions set forth in the Agreement. The City Council was aware of the remediation needs of the Property and the minutes of the Council meetings indicate that the Council understood they were taking responsibility for those remediation needs by discussing obtaining a state grant to fund the remediation of the Property.

---

[1] Defendant submits an affidavit of David Brown, the former mayor of the City of Charlotte, who signed the Agreement. In his affidavit he states that he believed the City's only obligation was the $100.00 purchase price and that the Council was "advised by the City Administration that monies from the State would be made available to pay for the clean-up of the site." (Brown Aff. at ¶¶ 4, 5.) That statement does not indicate that the City believed Plaintiff remained responsible for the cost of remediation. It simply indicates that the City believed, although apparently mistakenly, that the State would pay for the cost of remediation.
    The Court also notes that the final version of the Agreement, including the Conditions, was drafted by the Charlotte City Attorney. (Agreement at 4.)

9

For those reasons, the Court finds Defendant has failed to show a genuine issue of material fact as to whether the Agreement is unenforceable under the Charlotte City Charter.

### ii. Extension of Credit

Defendant's second argument is that the Agreement is unenforceable because it was made *ultra vires* and in violation of the Michigan Constitution of 1963 art. 7, § 26. The question presented is whether the conditions of the Agreement, in which Defendant agrees that the City, at it's sole cost, expense and control, will be responsible for the environmental compliance of the Property, unconstitutionally lends the credit of the state or a municipality in violation of the Michigan Constitution of 1963 art. 9, § 18 or art. 7, § 26.

Article 9, § 18 provides, in part, that "the credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution." Article 7, § 26 provides that "[e]xcept as otherwise provided in this constitution, no city or village shall have the power to loan its credit for any private purpose or, except as provided by law, for any public purpose."

Generally, Article 9, § 18 states that the state shall not lend its credit except as provided in the constitution. "The purpose of this provision is to make certain that the State, which itself cannot borrow, except as authorized, does not accumulate unauthorized debts by indorsing or guaranteeing the obligations of others." *Advisory Op. re Constitutionality of 1966 PA 346*, 158 N.W.2d at 418. Article 9, § 18 applies to local governments as well as political subdivisions and instrumentalities of the state. *See In re Request for Advisory Op. on Constitutionality of 1986 PA 281*, 422 N.W.2d

10

at 197(citing *Oakland Co. Drain Comm'r v. Royal Oak*, 10 N.W.2d 435 (1943) (construing the predecessor to Const. 1963 art. 9, § 18: 1908 Const. art. 10, § 12)).

The Michigan Supreme Court observed in *Gaylord v. Gaylord City Clerk*, 144 N.W.2d 460 (1966), that article 7, § 26 is an exception to the general rule of article 9, § 18, governing the lending of credit by municipalities. *See also In re Request for Advisory Op. on Constitutionality of 1986 PA 281*, 422 N.W.2d at 197. The Michigan Supreme Court held that "[i]n order to conform to the requirements of the art. 7, § 26 exception, the loan of a municipality's credit must be both: (1) authorized by law, and (2) for a public purpose." *In re Request for Advisory Op. on Constitutionality of 1986 PA 281*, 422 N.W.2d at 197. Therefore, the question is whether the condition of assuming the remediation costs of the Property constitute a loan of credit. If the Agreement authorizes the lending of the state's credit, it is unconstitutional pursuant to article 9, § 18. If it is a loan of municipal credit, then the two requirements of article 7, § 26, must be considered. However, if the Agreement is not a loan of credit at all, then there is no need to consider article 7, § 26.

The Michigan Supreme Court held that "[i]f the state or a municipality receives value in return for what it gives away, there is no loan of credit under the constitution." *In re Request for Advisory Op. on Constitutionality of 1986 PA 281*, 422 N.W.2d at 197. In *Alan*, the Michigan Supreme Court articulated this rule:

> Michigan case law interpreting Const. 1963, art. 9, § 18 is neither ample nor precise. It is clear the State or its subdivision the County cannot give anything away without consideration. Note that the Constitution as far as the State and County are concerned makes no difference between a public and a private purpose in this regard. When the State acquires or transfers something of value in return for value the State does not offend Const. 1963, art. 9, § 18.

200 N.W.2d at 684.

11

Upon review, the Court determines that there is no loan of credit in this case because there was an exchange of value. Defendant received the Property and Plaintiff received the sum of $100.00 plus Defendant's assumption of the costs of remediating the Property. Therefore, the Agreement does not violate article 9, § 18 of the Michigan Constitution. *See Advisory Op. on Constitutionality of 1986 PA 281*, *supra*; *Alan*, 200 N.W.2d 628 at 684; *Cordova,* 536 N.W.2d at 864-65.

However, Defendant contends that the Agreement is equivalent to the City indemnifying Plaintiff for an unknown amount and, therefore, it is equivalent to a loan of credit. (Def.'s Resp. at 15.) Defendant asserts this case is distinguishable from the case of *Cordova,* in which plaintiffs purchasers of land agreed that defendant seller "would remove 8,700 contaminated drums and 8,000 cubic yards of contaminated soil and sludge and plaintiffs would remove the phosgene from the site and pay defendant the sum of $600,000 to defray defendant's costs" in a stipulation and consent order. *Cordova*, 536 N.W.2d at 862. Additionally, paragraph 6 of the consent order in *Cordova* provided, in part, that:

> [Plaintiffs] shall not have any responsibility or liability in connection with any other corrective actions which the [Defendant] Department of Natural Resources or any other governmental agency may hereafter deem necessary or advisable in connection with the contamination emanating from the Story Chemical Corporation property, including, without limitation[,] the creation, maintenance and operation of any purge wells.

*Id.* The Michigan Court of Appeals held that:

> plaintiffs and defendant [Department of Natural Resources], who entered into the agreement not as a governmental claimant but as a party potentially liable for the cleanup of the site, are not precluded from agreeing with one another to apportion the costs of any cleanup between themselves in any manner they see fit. Accordingly,

>liability for the costs of the cleanup involved validly could be transferred between plaintiffs and defendant.

*Id.* at 864 (citing *Stolaruk*, 522 N.W.2d at 674); *see also Niecko v. Emro Mktg. Co.*, 973 F.2d 1296, 1300-01 (6th Cir. 1992) (holding that, in terms of financial responsibility, parties may allocate the liability for environmental "clean up" between them).

Upon review, the Court finds Defendant's argument unpersuasive. Prior to entering the Agreement, Defendant considered environmental assessments of the Property which estimated the cost of remediation at no more than $200,000.00. (*See* Compl, Exs. 3 & 4.) Defendant admits that it had full knowledge of the conditions of the Property at the time of the Agreement and of the applicable environmental regulations. (Compl. ¶ 26; Ans. ¶ 26.) The Court finds that the nominal purchase price of $100.00 clearly took into consideration the Conditions set forth in the Agreement and the necessary costs of remediation. Under *Cordova*, the Court determines that the conditions of the Agreement are not equivalent to a "loan of credit" simply because the actual cost of remediation of the Property was ultimately much higher than originally predicted. Although the unpredicted cost of remediation is certainly an unfortunate turn of events, Defendant is still held to the conditions set forth in the Agreement.

Furthermore, the Court notes that even if the Agreement were considered to be a loan of municipal credit, the Agreement meets the two qualifications of article 7, § 26 of the Michigan Constitution of 1963. Under § 26 the loan must: (1) be authorized by law, and (2) be authorized for a public purpose. *See In re Request for Advisory Op. on Constitutionality of 1986 PA 281*, 422 N.W.2d at 197.

As discussed above, the Agreement was authorized by the Charter since the City Council voted to proceed with the purchase of the property for $100.00 and the city Mayor and city clerk signed the Agreement. The Court also determines that the second prong is met because the purchase and remediation of the Property was done for the public purpose of creating a city park, which is the Property's current use. (Compl., ¶ 29; Ans., ¶ 29.) Therefore, the Court finds that the requirements of article 7, § 26 are met by the Agreement.

### iii.    *Ultra Vires*

Defendant argues that the Agreement is unenforceable because Defendant's actions in forming the Agreement were *ultra vires*. "A municipality cannot retain the benefits of a contract which has been fully performed by the other party, and which is neither *malum prohibitum* nor *malum in se*, and at the same time deny the validity of the contract because of defects in the manner of its execution." *DiPonio v. Garden City*, 30 N.W.2d 849, 852-53 (Mich. 1948) (citing *Coit v. City of Grand Rapids*, 73 N.W. 811 (Mich. 1898)); *see also Carey v. City of East Saginaw*, 44 N.W. 168 (Mich. 1889); *Spier v. City of Kalamazoo*, 101 N.W. 846 (Mich. 1904); *Cent. Bitulithic Paving Co. v. City of Mt. Clemens*, 106 N.W. 888 (Mich. 1906); *Webb v. Township of Wakefield*, 215 N.W. 43 (Mich. 1927); *L. W. Kinnear, Inc. v. City of Lincoln Park*, 244 N.W. 463 (Mich. 1932).

In this case, the Court finds that the Agreement is neither *malum prohibitum* nor *malum in se* and that Plaintiff has fully performed the Agreement. Furthermore, the Property is currently being used as a city park for Defendant's benefit. Upon review, the Court determines that Defendant may not take advantage of the defense that its actions were *ultra vires* since it is enjoying the benefits of the Agreement.

**IV.    Conclusion**

For the above reasons, Defendant's Motion to Dismiss shall be denied and Plaintiff's Motion for Summary Judgment shall be granted as to the issue of liability as to Count I of the Complaint.

An Order and Partial Judgment in accordance with this Opinion shall issue.

|  |  |
|---|---|
|  | /s/ Richard Alan Enslen |
| DATED in Kalamazoo, MI: | RICHARD ALAN ENSLEN |
| April 26, 2005 | UNITED STATES DISTRICT JUDGE |